**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**COURT FILE NO.:**

| | |
|---|---|
| Kassidy Stockman,<br><br>   Plaintiff,<br><br>vs.<br><br>Bureau of Collection Recovery, LLC,<br><br>   Defendant. | **COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

## JURISDICTION

1. Jurisdiction of this Court arises under 28 U.S.C. §1331 and pursuant to 15 U.S.C. §1692k(d) and 28 U.S.C. §1367 for pendent state law claims.

2. This action arises out of the Defendant's violations of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. (hereinafter "FDCPA").

3. Venue is proper in this District because the acts and transactions occurred here, Plaintiff resides here, and Defendant transacts business here.

## PARTIES

4. Plaintiff Kassidy Stockman (hereinafter "Stockman" or "Plaintiff") is a natural person residing in the County of Hennepin, State of Minnesota, and is a "consumer" as that term is defined by 15 U.S.C. §1692a(3).

5. Defendant Bureau of Collection Recovery, LLC (hereinafter "BCR" or "Defendant") is a debt collector that operates from an address of 7575 Corporate

Way, Eden Prairie, Minnesota 55344.  BCR is a "debt collector" as that term is defined by 15 U.S.C. §1692a(6).

## FACTUAL ALLEGATIONS

6. Ms. Stockman allegedly incurred financial obligations with Wells Fargo Bank, which is a creditor as that term is defined by 15 U.S.C. §1692a(4).

7. The alleged obligation was primarily for personal, family or household purposes, which is an alleged "debt" as that term is defined by 15 U.S.C §1692a(5), namely a consumer debt.

8. Sometime prior to February 7, 2013 the alleged debt was consigned, placed or otherwise transferred to BCR for collection from Ms. Stockman.

9. On February 7 and February 8, 2013, Ms. Stockman received calls to her cellular phone from the number (952) 955-7141, no messages were left.

10. On February 8, 2013, at 11:48 a.m., in a call lasting 12 minutes, Ms. Stockman called (952) 955-7141 and reached BCR, her call was routed to an individual who indicated that his name was Jeremy.

11. Defendant's representative Jeremy stated that he was a debt collector, that the conversation was an attempt to collect a debt for an account that was past due through Wells Fargo, that any information obtained would be used for that purpose and that the call may be recorded or monitored, and verified Ms. Stockman's address.

12. After the warnings and address verification, Jeremy asked Ms. Stockman how much she could pay on the debt, to which Ms. Stockman replied that she was unable to pay anything at that time.

13. Jeremy then stated that he felt he should let Ms. Stockman know that debts such as the debt they were discussing were reported to a company called Early Warning Services, which could freeze, close or offset the money in her new bank account to satisfy the debt, and because it is an automated service it will do so even if the consumer is making payments.

14. Jeremy explained that Early Warning Services (hereinafter, EWS) and BRC had nothing to do with one another, but he felt that Ms. Stockman should know what could happen.

15. Jeremy then stated that he wanted to work with Ms. Stockman to get the debt resolved as soon as possible so that none of those things happened to her.

16. Jeremy went on to ask Ms. Stockman whether she was anticipating a tax refund.

17. Ms. Stockman was alarmed about the prospect of EWS taking money from her bank account and asked Jeremy for more information about EWS and if she made a payment and started working with BCR to resolve the debt, would that prevent her current bank account from being frozen or closed.

18. Jeremy responded that many times it is "a toss up" and even when the consumer is making small payments, bank accounts are sometimes frozen or emptied by EWS.

19. Jeremy told Ms. Stockman that the best they could do was to take a very large payment and that having a large payment on the record would demonstrate that she was making an effort to pay off the debt in the event that there was an inquiry.

20. Ms. Stockman excused herself by telling Jeremy that she was at work and did not have her bank account information available and she would have to call back with the information to make a payment.

21. Confused and alarmed, Ms. Stockman researched Early Warning Systems on the internet, and called the company.

22. Ms. Stockman asked the customer service representative at EWS whether it freeze her bank account or take money from her bank account without her permission, and explained that she had just with a debt collector and that she had been told that her bank account could be seized if she did not pay the debt quickly.

23. The woman from EWS explained that it was a consumer credit reporting agency and that it had nothing to do with debt collection and did not handle people's money in any way.

24. The EWS Representative provided Ms. Stockman with information regarding the reporting of the Wells Fargo account, how to dispute inaccurate reports and the potential consequences of having a collection account on her credit report, including impact on her ability to obtain credit.

25. Ms. Stockman asked several times whether EWS had anything to do with taking money out of her bank account, and was told no every time.

26. On February 8, 2013, at 12:39 p.m., Ms. Stockman placed a second call to BCR, this call lasted 12 minutes.

27. Ms. Stockman spoke with a woman at BCR and asked for more information about Early Warning Services, explaining that she had spoken with EWS and that she felt that she had been given incorrect information, the woman at BCR said that she was not sure and transferred Ms. Stockman to her supervisor.

28. Ms. Stockman told the supervisor that she had spoken with a man earlier that day, that she thought the information he had given her was incorrect because she had spoken with EWS and had been informed that EWS has nothing to do with freezing bank accounts or closing bank accounts.

29. The supervisor told Ms. Stockman that she thought that was odd because in that office they see it happen "all the time," and that "people call in and are mad because they think that we did it, but is them (EWS)."

30. Ms. Stockman asked the supervisor whether BCR had any control over it and if she made a payment, could BCR prevent her bank account from being frozen or taken.

31. The supervisor stated that she did not know because if often happens that people with a payment plan will have their bank accounts frozen and stated "a lot of times people will have a tax return or something put in the account and the whole thing will be taken out."

32. Ms. Stockman asked the supervisor how she could make sure that her bank account was not frozen or emptied.

5

33. The supervisor replied that it was important that Ms. Stockman pay off the debt as quickly as possible and said "what we can do is take half of the payment now and half of it in two weeks."

34. Ms. Stockman told the supervisor that the most she could come up with was $250.00, and asked whether they could settle with her.

35. The Supervisor said the best settlement they could offer was $400.00.

36. Ms. Stockman excused herself, explaining that she was at work and did not have her bank account information with her.

37. The supervisor asked what time Ms. Stockman got off work, and when Ms. Stockman replied "3:00 p.m." the supervisor said that she would be there until 4:30 and told Ms. Stockman to call her back when she got off work.

38. Ms. Stockman was very upset after speaking with BCR a second time.

39. Ms. Stockman could not wait until after work to figure out whether her bank account was at risk, so she went to the bathroom and called her bank, which was another national bank, not Wells Fargo.

40. On February 8, 2013, at 1:33p.m., in a call lasting 11 minutes, Ms. Stockman spoke with a phone banker.

41. Ms. Stockman asked the banker whether it was possible for a company to take money out of my bank account without her permission.

42. The banker asked whether Ms. Stockman had given out her account number, and advised her not to and he stated that as far as he knew they would need a levy or a court order to take money out of her account.

6

43. Ms. Stockman told the banker what BCR has told her about EWS; that it might freeze her account and take money out.

44. The banker told Ms. Stockman that as far as he knew, the purpose of EWS was to notify banks when consumers were opening account, and since her account was already opened, she should be fine.

45. The banker said that EWS was a system that bankers check to see whether there was fraud or identity theft before opening an account, and that to his knowledge EWS was not at all involved in debt collection efforts.

46. Ms. Stockman was still upset, and worried about whether she might be a victim of a scam or identity theft or something.

47. After work, at 3:41 p.m. on February 8, 2013, Ms. Stockman made a third call to BCR, this time the call lasted 7 minutes.

48. Ms. Stockman asked the first person she spoke with for more information about EWS, the woman said that she would give her as much information as she has and then told her that she was going to transfer her to the person she had spoken with the first time she called, Ms. Stockman asked for his name, and that was when she learned that his name was Jeremy.

49. When Jeremy came on the line, Ms. Stockman told him that she was very confused about the conversation they had that morning and she needed more information about EWS.

50. Jeremy said "Well, it's a consumer reporting agency, it's confusing. Can you hold? I'll find out for you."

51. When Jeremy returned he explained to Ms. Stockman that the information given to banks by EWS would allow the bank to freeze her account without any legal documents because she had signed a contract with Wells Fargo when she opened the Wells Fargo account.

52. Ms. Stockman asked Jeremy whether that still applied even if her bank was not affiliated with Wells Fargo.

53. Jeremy confirmed that even though her bank was not affiliated with Wells Fargo, the contract she signed allowed Wells Fargo to offset the money owed to it without any further legal action.

54. That Ms. Stockman was very upset for most of the day, and her fear and anxiety affected her work, her appetite and her sense of well-being.

55. That Jeremy made multiple false or misleading representations to Ms. Stockman in his efforts to collect a debt including but not limited to the false statement that her bank account may be seized to satisfy the alleged debt at any time and that she had entered into a contract which allowed Wells Fargo to take money from her bank account.

56. That the supervisor who spoke to Ms. Stockman made multiple false and misleading representations in her efforts to collect a debt including but not limited to the false representation that Ms. Stockman's bank account may be frozen or seized if the alleged debt was not paid, and that Ms. Stockman's tax refund could be taken from her bank account in order to satisfy the alleged debt.

57. That the false and misleading representations made my Jeremy and the supervisor violated the FDCPA, 15 U.S.C. §1692e, §1692e(2)(A), §1692e(4), §1692e(5), §1692e(10), §1692f and §1692f(6).

58. That the false and misleading representations made by Jeremy and the supervisor were intended to cause fear and constituted harassment or abuse in violation of the FDCPA, 15 U.S.C. §1692d.

59. That, upon information and belief, Defendant BCR failed to provide Ms. Stockman with written notice within five days of the initial communication of her right to dispute the debt and request verification of the debt, in violation of the FDCPA, 15 U.S.C. §1692g, §1692g(a)(3) and §1692g(a)(4).

## Vicarious Liability

60. Defendant Bureau of Collection Recovery, LLC is the master, employer, principal and/or joint venture of the Jeremy and the supervisor and is therefore vicariously liable for their acts and omissions.

## TRIAL BY JURY

61. Plaintiff is entitled to and hereby demands a trial by jury. US Const. Amend. 7. Fed. R. Civ. Pro. 38.

## CAUSES OF ACTION

## COUNT I

## VIOLATIONS OF THE
## FAIR DEBT COLLECTION PRACTICES ACT 15 U.S.C. §1692 ET SEQ.

62. Plaintiff incorporates by reference each and every above stated allegation as though fully stated herein.

63. The foregoing acts of the Defendant constitute distinct violations of the FDCPA against the Plaintiff herein, including but not limited to each and every one of the above cited provisions of the FDCPA, 15 U.S.C §1692 et. seq.

64. As a result of said violations, Plaintiff is entitled to an award of statutory damages up to $1,000.00 from Defendant, and for Plaintiff's attorney fees and costs pursuant to 15 U.S.C. §1692k(a)(2)(A) and 15 U.S.C. §1692k(a)(3).

65. As a result of said violations, Plaintiff is entitled to an award of actual damages from Defendant in an amount to be determined at trial pursuant to 15 U.S.C. §1692k(a)(1).

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that this Court enter the following judgment, in Plaintiff's favor:

### COUNT I: FDCPA VIOLATIONS

- For declaratory and injunctive relief;
- For an award of statutory damages of $1,000.00 for the Plaintiff herein, for violations of the FDCPA pursuant to 15 U.S.C. §1692k(a)(2)(A), against Defendant;
- For an award of costs and reasonable attorneys' fees under the FDCPA pursuant to 15 U.S.C. §1692k(a)(3), against Defendants, for Plaintiff herein;

- For an award of actual damages, costs and reasonable attorney fees pursuant to 15 U.S.C. §1692k(a)(1) against each and every Defendant herein in an amount to be determined at trial;

## SUCH OTHER RELIEF

- For such other and further relief as may be just and proper.

Dated:  March 11, 2013.                           **WEIG LAW FIRM, LLC.**

                                        By:  /s/ Paul H Weig
                                             Paul H Weig
                                             Attorney for Plaintiff
                                             Attorney I.D. No.: 0288792
                                             3101 Irving Avenue South
                                             Minneapolis, Minnesota 55408
                                             Telephone:612-501-4841